UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES DEKARSKE,

                Plaintiff,                                        Case No. 11-12132

                                                             Paul D. Borman

v.                                                    United States District Judge

FEDERAL EXPRESS CORPORATION,

                Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 26)

      This matter is before the Court on Defendant Federal Express Corporation's ("FedEx") Motion for Summary Judgment. (ECF No. 26.) Plaintiff filed a response (ECF No. 29) and FedEx filed a reply (ECF No. 30). The Court held a hearing on July 2, 2013. For the reasons that follow, the Court GRANTS FedEx's motion for summary judgment.

**INTRODUCTION**

      Plaintiff James Dekarske was terminated by Defendant Federal Express Corporation ("FedEx") on July 23, 2009, for a failure to report an occurrence of damage to a customer's property that he acknowledges occurred while he was working as a FedEx courier and driving a FedEx vehicle. Dekarske admits the failure to report but argues that any damage caused was minimal, that he paid the customer himself in full satisfaction of any damage and that FedEx used the occurrence as a pretext to terminate him because of his age. Dekarske also claims that FedEx terminated him in retaliation for an internal complaint that he filed on April 8, 2008, alleging unequal treatment by his supervisor. FedEx now moves for summary judgment. For the reasons that follow, the Court

1

GRANTS FedEx's motion for summary judgment.

## I.   FACTUAL BACKGROUND

Dekarske first applied for employment with FedEx on June 29, 2000, at the age of 56, seeking a position as a courier.  (ECF No. 26, Def.'s Mot. Summ. Judg. Ex. B, March 2, 2012 Deposition of James Dekarske 31-33; Dekarske Dep. Ex. 6, Employment Application.)  Dekarske was hired on June 29, 2000, and acknowledged that the offer of employment was "contingent upon successful completion of all required training." (Dekarske Dep. Ex. 7, June 20, 2000 Letter to James Dekarske from Thomas Mikkor.)  On September 21, 2000, Dekarske was terminated by FedEx for his failure to achieve a satisfactory grade in his courier training class.  (Dekarske Dep. at 34, Ex. 8, September 18, 2000 Termination Letter.)  Dekarske acknowledges that he failed the courier training and was terminated, but asserts that he was told at the time he was terminated that he was qualified to drive a FedEx shuttle.  (Dekarske Dep. at 34.)

On October 24, 2000, Dekarske did apply for a position as a package handler and was hired by FedEx as a permanent part-time handler/shuttle driver at the Jackson, Michigan station. (Dekarske Dep. 37, Exs. 9 (Employment Application), 10 (Offer and Acceptance of Position).)  In the Employment Agreement that Dekarske signed and acknowledged having read, Dekarske agreed to "comply with the guidelines established in the Company's policies, rules, regulations and procedures," and agreed to bring any legal actions against FedEx "within the time prescribed by law or 6 months from the date of the event forming the basis [of the suit], whichever expires first." (Dekarske Dep. Ex. 9, PgID# 409-10.)  In October, 2003, Dekarske was promoted to the position of courier.  (Def.'s Mot. Summ. Judg. Ex. J, August 22, 2012 Declaration of Gary Hickman ¶ 5, Ex. 1.)

During the course of his employment, Dekarske acknowledged on several occasions that he understood and would abide by FedEx's Driving Qualification Policy, which required FedEx drivers to report to FedEx any traffic or driving violation received while operating a FedEx vehicle. (Dekarske Dep. 52-53, Ex. 13.) Specifically, in the certifications that Dekarske signed on numerous occasions, Dekarske agreed as follows: "If I receive a traffic violation (other than parking) in any vehicle, I must notify FedEx management in writing and the state that issued my driver's license of the citation by the next business day and before operating a FedEx vehicle." (Dekarske Dep. Ex. 13.) On June 11, 2008, Dekarske received a speeding ticket while driving a FedEx vehicle and failed to report this moving violation to FedEx. (Dekarske Dep. at 96.) Only after Dekarske's supervisor discovered the moving violation on Dekarske's motor vehicle incident report did Dekarske admit the violation and submit a report conceding that he had received the speeding ticket. (Dekarske Dep. Ex. 18.) Dekarske admits that he was driving a FedEx vehicle at the time he was ticketed and concedes that he did not report this violation because in his opinion, "FedEx wanted to know too much of [his] personal business." (Dekarske Dep. at 96.) Dekarske was disciplined for this failure to report on September 18, 2008, with a warning letter from his supervisor, Terry Feltman, informing him that "further instances of this nature will not be tolerated and may lead to more severe action, up through immediate termination." (Def.'s Mot. Summ. Judg. Ex. 19, September 19, 2008 Letter to James Dekarske from Terry Feltman.) The letter informed Dekarske that he could submit an internal complaint regarding the action taken in the warning letter if in good faith he felt the action was unfair. Dekarske never internally appealed this disciplinary action. (Dekarske Dep. 97.)

FedEx maintained a strict reporting policy with respect to "accidents" and "occurrences"

involving any FedEx vehicle that "com[es] in contact with any object, property or person," requiring strict compliance with FedEx Policy (P8-90) which dictates that such incidents be reported immediately to management. (Dekarske Dep. Ex. 14; Hickman Decl. ¶ 11, Ex. 7, Policy P8-90, Vehicle Accidents/Occurrences, PgID# 897.) The policy in effect during Dekarske's employment defined an "accident" as any event involving a FedEx vehicle that resulted in damage in excess of $500 and defined an "occurrence" as any event involving a FedEx vehicle resulting in damage less than $500. (*Id*.) The policy provided that any late reported or unreported accident or occurrence would be considered a violation of FedEx's Acceptable Conduct Policy (P2-5) and would "result in discipline up to and including termination." (Dekarske Dep. Ex. 14; Def.'s Mot. Summ. Judg. Ex. J, Hickman Decl. ¶¶ 11, Ex. 7.) On January 3, 2006, Dekarske expressly acknowledged these reporting requirements, and the potential for termination for failure to comply, by attesting that he had read and understood the policy and that he understood that he would be held accountable for his actions in contravention of the accident/occurrence reporting policy. (Dekarske Dep. Ex. 14.) Dekarske knew that a failure to report an accident or occurrence was a violation of FedEx policy "if he did cause the problem." (Dekarske Dep. at 54-55.)

FedEx utilizes a computer-based employee feedback system called the "Online Courier Counseling" system, or "OLCC." (Def.'s Mot. Ex. D, July 23, 2012 Deposition of Steven Feltman, 9.) The OLCC involves a supervisor's electronic documentation of notes, both positive and negative, regarding a courier's performance. (*Id*.) The OLCC can include remarks regarding discipline, or comments on road performance, i.e. meeting or not meeting stops-per-hour goals, or requests for days off. (*Id*. at 11, 24.) Dekarske's supervisor from August, 2006 until his termination in 2009, Steven Feltman, had a practice of entering counseling comments in the OLCC on couriers

4

at least once a month.  (Def.'s Mot. Ex. D, Feltman Dep. at 24.)

Dekarske's OLCC entries reveal that Dekarske had his share of both compliments and counseling from his supervisors throughout his time at FedEx.  (Def.'s Mot. Ex. B, Dekarske Dep. Ex. 15.)  For example, in June, 2003, Dekarske sideswiped a car while backing out of a driveway and was told that as a professional driver he would be held to a higher standard.  (*Id*. at PgID# 475.) In February, 2004, Dekarske was complimented for having had perfect attendance for the fiscal year 2003.  (*Id*.)  In October, 2004, he was complimented for his willingness to be available whenever his supervisor was short on drivers.  (*Id*. at PgID# 474.)  In late October, 2004 and early 2005, he had to be reminded that he needed to be off the clock for a certain number of hours to comply with DOT regulations.  (*Id*. at PgID# 472.)  In October, 2005, he was directed to go through 4 weeks of best practices training because his methods were "poor."  (*Id*. at PgID# 470.)  He was noted to have improved his practices after participating in the 4 weeks of training.  In June, 2006, he was involved in a preventable accident when he failed to check his blind spot and collided with a car in a parking lot.  (*Id*. at PgID# 468.)  He was also complimented around that same time for driving out of his way to deliver medication to a customer.  (*Id*. at PgID# 469.)  He was also counseled in August, 2006, that he was having late pick ups and that his service needed to be 100%.  (*Id*. at PgID# 467.)  In October, 2006, he was counseled that his service quality standards had declined and that he should communicate with dispatch if he felt over capacity.  (*Id*. at PgID# 464-65.)

In January, 2008, Dekarske was informed that his routes had been changed due to an elimination in routes throughout the Jackson area.  Dekarske was aware that other couriers were having their routes adjusted as well in response to the decrease in volume.  (Dekarske Dep. 135-36, Ex. 15, PgID#463-64.)  Also in January, 2008, he was counseled that there had been a decrease in

his road performance because he had too much downtime between pickups.  In an effort to address this, FedEx was going to move some delivery activity to Dekarske's route to "fill some of this gap time." (Dekarske Dep. Ex. 15, PgID#462-63.)  In March, he was complimented for increasing his road performance from the prior month.  (*Id*. at PgID# 460-61.)  In April, he was informed that his road performance had decreased again in March but in May he was told that he had shown "much improvement" in the month of April and was "moving in the right direction." (*Id*. at PgID# 458-59.) In June, he was counseled that he had just missed his road performance of 98% in May but that he was on track to achieve his goal for June.  (*Id*. at PgID# 457-58.)  In July, Feltman noted that Dekarske ran a 99.27% road performance and had achieved his goal for the past few months, thanking him for his continued focus.  (*Id*. at PgID# 456-57.)  In July, he was given a warning for striking a tree branch damaging the mirror on the passenger side of his truck.  (*Id*. at PgID# 455-56.) In August, he was noted to be slightly below his road performance goal but with continued coaching and feedback, it was hoped he would get back to goal for August performance figures.  (*Id*. at PgID# 454-55.)  Later in August, he was complimented for covering an open route on his day off and thanked for contributing to the level of service at the Jackson station.  (*Id*. at PgID# 452-53.)  In September, he was noted as being above performance and was again thanked for his service and dedication to FedEx.  (*Id*. at PgID# 451-52.)  In October, he was again complimented for being available to cover additional deliveries while still maintaining his own performance goals.  (*Id*. at PgID# 450-51.)  In November, he was again complimented on his October road performance and his efforts to give FedEx customers the service they deserve.  (*Id.* at PgID# 448-49.)  In December, it was noted that his November performance was below goal and that pick ups in his area had declined due to lack of volume.  Nonetheless, in January, 2009, he was complimented for the work

he performed in 2008 and for his teamwork and dedication.  In February, he was noted to have performed below goal in January, which was noted to be a challenging month generally due to road conditions and weather.  (*Id*. at PgID# 441-444.)

Also in February, he was counseled about harassing behavior toward coworkers and given a copy of the FedEx anti-harassment policy.  (*Id.* at PgID# 440-441.)  Dekarske thought this may have related to comments he could have made to two blonde co-workers whom he referred to as "Dizzy" and "Daffy," or "the Wit sisters, Dim and Half."  (Dekarske Dep. at 67-69.)  In April, 2009, he was informed that his road performance for the month of March was 91.60%, well below goal and that he needed to step up his input and effort.  (*Id*. at PgID# 439-40.)  In May, 2009, it was noted that he had not met goal for the 4th month in a row, despite the fact that the roads had improved and Feltman noted that he was going to seek senior management review.  (*Id.* at PgID# 438-39.)  In June, Dekarske was noted to be in the 80th percentile among his peer couriers for achieving road performance goals and remained safe from accident or injury.  (*Id.* at PgID# 435-36.)  In July, 2009, he was congratulated on exceeding the June road performance level and again thanked for his contribution to the Jackson team.  (*Id*. at PgID# 434-35.)

On April 8, 2008, Dekarske filed an internal complaint accusing his supervisor, Terry Feltman, of treating his coworkers more favorably with regard to hours and routes.  (Dekarske Dep. at 71, Ex. 16.)  The internal complaint alleged that Feltman was criticizing Dekarske's road performance and telling him to take longer lunches, in an apparent effort to increase Dekarske's stops per hour record.  The complaint alleged that Feltman "kep[t] telling [Dekarske] or implying that [he] was slow because [he was] old."  The internal complaint closed by saying that Dekarske felt he could not complain to management about these things because Feltman would retaliate

against him.  (Dekarske Dep. Ex. 16, PgID# 477-49.)  In his deposition, Dekarske explained that this comment in the internal complaint was based upon his belief that "any company will retaliate against you if you complain."  (Dekarske Dep. at 87-88.)  The complaint checked the boxes indicating that both Dekarske's age and his status as a Vietnam veteran motivated Feltman's decisions.  (Dekarske Dep. Ex. 16, PgID# 477-482.)

Louis Olechowski, a Human Resources Manager for FedEx, investigated Dekarske's internal complaint and conducted a phone interview with Dekarske as part of his investigation, during which Dekarske was disrespectful and belligerent.  (Def.'s Mot. Ex. K, August 20, 2012 Declaration of Louis Olechowski ¶ 5.)  Olechowski testified that during the phone interview, Dekarske never mentioned that Feltman called him an old man or ever referred to him as being old.  (*Id*. ¶ 6.)  Olechowski reported his findings to Kenneth Wilson, the managing director for FedEx Human Resource Compliance Department for the Great Lakes Region and concluded that Dekarske's claims of age discrimination were unsubstantiated.  (*Id*. ¶ 7.)  FedEx reported these findings to Dekarske in a letter which indicated that the investigation had revealed no policy violations and invited him to report any acts of retaliation for his filing of the complaint to human resources.  (Dekarske Dep. Ex. 17, May 29, 2008 Letter from Kenneth Wilson.)  Dekarske never challenged FedEx's denial of his internal complaint.  According to Dekarske, a couple of months after his complaint was denied, Feltman said to Dekarske: "You didn't prove your case."  (Dekarske Dep. at 93.)

Dekarske acknowledged that other couriers, all younger than he, also had their hours cut and had been criticized for their road performance.  (Dekarske Dep. at 74-76.)  Dekarske complained about not being assigned a certain shuttle run, but conceded that if FedEx had assigned the shuttle route to Dekarske they would have had to pay him overtime when another employee could be

8

assigned the route within regular work hours.  (Dekarske Dep. at 78.)  Dekarske felt that economics

should not have been a consideration because he "had more time than" the worker who was assigned

the shuttle route.  Dekarske referred to the fact that he carried a union card and that "seniority

counts," although he acknowledged that FedEx was not unionized, but he "wished they were."  (*Id*.

at 78-79.)  In Dekarske's opinion, union and management "never get along," and he "consider[s]

anything on management like a hemorrhoid."  (*Id*. at 124-25.)  Dekarske explained that assigning

the route to the other worker discriminated against him because "[Dekarske] had more time he did."

(*Id*. at 79.)

Initially in his deposition, Dekarske testified that Feltman never said that Dekarske was old,

only that he was "slow," but that Dekarske "wondered" if Feltman was implying he was old because

Dekarske was the oldest man in the shop.  (*Id*. at 83, 90.)  Later in the deposition, after a long break

and consulting with his attorney, Dekarske recalled that Feltman "several times" had called

Dekarske "an old man."  (*Id*. at 128.)  Dekarske said his memory was "the second shortest thing he

had," but that he had just remembered that Feltman called him "old man" about 10-20 times.  (*Id*.

at 129.)  Dekarske knew of no instances where Feltman had retaliated against an employee in the

past.  (*Id*.)

None of the FedEx witnesses recalls hearing Feltman address Dekarske as "old man," or

criticize him for being "slow," but several recall that Dekarske was often called "Gramps" by his

co-workers and that "Gramps" was Dekarske's nickname.  (Def.'s Mot. Ex. A, July 11, 2012

Deposition of Samuel Bishop, 11; Def.'s Mot. Ex. C, July 11, 2012 Deposition of Roger Dickinson,

27-28; Def.'s Mot. Ex. E, July 11, 2012 Deposition of David Jackson, 20, 24; Def.'s Mot. Ex. F, July

23, 2012 Deposition of Sharon Mathein, 18; Def.'s Mot. Ex. G, July 23, 2012 Deposition of

Christina Simpson, 18; Def.'s Mot. Ex. H, July 23, 2012 Deposition of Barbara Spellman, 22-23.)

Some FedEx employees recalled that there was tension between Feltman and Dekarske and that

there was "always something going on" between them.  (Bishop Dep. at 10; Spellman Dep. at 19.)

Others recalled that the two appeared to get along fine.  (Simpson Dep. at 13.)

On July 23, 2009, while pulling into a driveway to make a delivery to a customer, Dekarske

hit a reflective driveway marker with his truck.  (Dekarske Dep. at 100-04, Exs. 22-24; July 23, 2012

Deposition of Terry Feltman at 65-66, Exs. 6-7.)  Dekarske testified that he was aware that he hit

the reflective marker and in fact offered to pay the customer, and did pay the customer, $3 to "keep

his mouth shut" and to not report the incident to FedEx:

> Q:     You were aware that you had hit a marker and that the customer was very
>        unhappy, correct?
>
> A:     Right.
>
> Q:     And did you re – in fact, you offered to pay for the marker while you were
>        there, didn't you?
>
> A:     Yes.
>
> Q:     You offered to give that customer money for the marker?
>
> A:     Right.
>
> Q:     Did you report that incident to your manager when you got back to the
>        station?
>
> A:     No, because I figured the suit was already – he was – the customer was
>        already satisfied.
>
> Q:     Did he take the $3.00?
>
> A:     Yes, he did.

(Dekarske Dep. at 101-02.)  He decided to pay off the customer because the customer was "yelling

and screaming and bitching" at Dekarske. (*Id*. at 108-09.) Dekarske did not report any aspect of the incident to his supervisor - that he hit a driveway marker, that the customer was very unhappy or that he paid the customer $3 to keep quiet. (*Id*. at 109.) Later that day, the customer called FedEx to complain that Dekarske's truck had taken a chunk out of the concrete at the edge of his driveway. (Feltman Dep. at 44, 51, 65-66, Ex. 6.) It was during the course of this conversation that Feltman first learned that Dekarske hit the driveway marker and paid the customer $3 to replace it, none of which Dekarske had reported to FedEx as required by FedEx policy. (*Id*. at 47, 65-66, Ex. 6.)

Feltman went to the customer's home and photographed the damage. (Def.'s Mot. Summ. Judg. Ex. D, Feltman Dep. 48, Exs. 2-5.) The photos do not really depict the damage very clearly, as Feltman concedes in his deposition. (Feltman Dep. at 49.) Ultimately, Dekarske was terminated for failing to report to FedEx that he had caused property damage to the customer's driveway marker. (*Id.* at 45-46.) Dekarske was presumed not to have known of the damage to the driveway but had conceded that he was aware of the claimed damage to the reflector and admitted that he had paid the customer to keep quiet about it.

On July 23, 2009, Dekarske was placed on suspension with pay pending an investigation into the potential violation of the FedEx Express Driving Qualifications Policy and the Acceptable Conduct Policy. (Def.'s Mot. Ex. 21, July 23, 2009 Letter of Suspension from Terry Feltman to James Dekarske.) On July 30, 2009, Dekarske's employment was terminated in accordance with Acceptable Conduct Policy 2-5 for failure to report the damage to the customer's personal property while paying the customer to cover the damage to the driveway marker. (Def.'s Mot. Ex. 22, July 30, 2009 Termination Letter.) The termination letter invited Dekarske to utilize the internal complaint process if he felt the action to be unfair. Dekarske did engage in the internal complaint

11

procedures and the decision to terminate his employment was upheld based upon his failure to report

an occurrence in accordance with Policy P8-90 and P4-48. (Def.'s Mot. Ex. 27, August 17, 2009

Letter to James Dekarske from Kenneth Wilson; Def.'s Mot. Ex. J, Hickman Decl. ¶ 16.)

According to the testimony of several FedEx couriers, the incident that damaged the

customer's driveway marker is the type of occurrence that they would have felt obligated to report

under the FedEx policy, which required them to report any event in which their FedEx vehicle came

in contact with any object. (Jackson Dep. at 18, 22; Simpson Dep. at 37; Spellman Dep. at 15.)

Likewise, FedEx Human Resource manager Gary Hickman agreed with Jackson Station

management that Dekarske's failure to report the facts that he damaged the customer's marker and

then attempted to pay the customer to try resolve the dispute and prevent the customer from

reporting the incident was a terminable failure to report under FedEx's Vehicle

Accidents/Occurrences Policy. (Def.'s Mot. Ex. J, Hickman Decl. ¶ 15.)

## II.     STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim,

or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after

the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ.

P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no

genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed.

R. Civ. P. 56(a). "Of course, [the moving party] always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at

323.  *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).  "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e). The rule requires the  non-moving party to introduce "evidence of evidentiary quality"

13

demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party." *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 759 (6th Cir. 2010).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial.... In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).

## III.    ANALYSIS

### A.    The Sixth Month Contractual Limitations Period in Dekarske's Employment Agreement Bars His Claims

FedEx argues that Dekarske's claims are barred by the six month limitations period contained in his Employment Agreement. Dekarske does not deny that he agreed to the six month limitation period in signing his Employment Agreement and does not assert any traditional contract defenses in an effort to defeat enforcement of the provision. Dekarske argues instead that enforcement of the limitations period denies him his legal right to bring his discrimination claim because it forecloses his ability to wait to receive a right to sue letter from the EEOC before bringing suit, which Dekarske claims is a jurisdictional prerequisite or at least a condition precedent to filing an ADEA claim.

14

Dekarske is wrong.  Dekarske analogizes to the statutory preconditions for commencing civil actions under Title VII, which require that a complainant receive a right to sue letter from the EEOC prior to commencing a civil case.  *See* 42 U.S.C. § 2000e-5(f)(1).  However, the ADEA, unlike Title VII, does not require a complainant to wait to receive a right to sue letter before proceeding with a civil action.  The ADEA requires a complainant to wait 60 days after *filing* a charge of discrimination with the EEOC before commencing a civil action: "No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission."  29 U.S.C. § 626(d).  A charge of discrimination under the ADEA must be filed within 300 days of the "last act of discrimination."  *Id.*  Thus, a complainant who files an EEOC charge and waits 60 days has satisfied all statutory preconditions to commencing a civil action under the ADEA.

Several courts in other circuits have recognized this distinction between Title VII and the ADEA, and Dekarske points to no Sixth Circuit law to the contrary.  *See, e.g. Holowecki v. Federal Exp. Corp.*, 440 F.3d 558, 563 (2d Cir. 2006) ("Unlike Title VII, the ADEA does not require an aggrieved party to receive a right-to-sue letter from the EEOC before filing suit in federal court."); *Julian v. City of Houston, Tex.*, 314 F.3d 721, 725, 726 (5th Cir. 2002) (noting that "[a]lthough Title VII provides that the right to bring suit does not arise until after the EEOC has issued a right-to-sue notice, the ADEA has no such requirement," therefore "a complainant who timely files the EEOC charge and then observes the sixty-day waiting period has satisfied the statutory preconditions to filing suit [under the ADEA]" and "the claimant's independent right to sue arises automatically upon the expiration of sixty days after filing of the charge with the EEOC") (footnotes, internal quotation marks and citations omitted).

15

Pursuant to his Employment Agreement with FedEx, Dekarske had six months from the last act of discrimination (his termination on July 30, 2009), in which to (1) file his EEOC charge, (2) wait 60 days, and (3) commence his action in this Court. Nothing prevented Dekarske from filing his charge within the six month limitation period - had he filed his EEOC charge with dispatch, he would have been left with a full four months in which to commence this civil action on or before January 30, 2010. Even giving Dekarske the benefit of the time period during which his claim was being addressed through FedEx's internal appeals process, that process was complete and the termination upheld on November 23, 2009. (Def.'s Mot. Ex. J, Hickman Aff. ¶ 16.) Using this later date, Dekarske had until May 23, 2010, to file his EEOC charge, wait 60 days and commence this action. Dekarske filed this action on May 16, 2011, well beyond the six month limitation period to which he agreed when he signed his Employment Agreement with FedEx. Accordingly, Dekarske's claims are time barred in their entirety.[1]

### B.   Even Assuming Dekarske's Claims Were Not Time Barred, FedEx is Entitled to Summary Judgment on Dekarske's ADEA and ELCRA Discrimination Claims[2]

The Age Discrimination Employment Act, 29 U.S.C. § 621-634 (the "ADEA") prohibits

---

[1] This exact six month limitation in a similar FedEx employment agreement has been enforced to time-bar an ADEA claim. *See Ray v. Fedex Corporate Servs., Inc.*, 668 F. Supp. 2d 1063, 1069 (W.D. Tenn. 2009) (finding six month statute of limitations provision in Employment Agreement enforceable). Dekarske does not argue that the six month limitation period is unenforceable as to his state law claims. The Court notes that Michigan courts have held that six month contractual limitations on bringing suit do not violate public policy. *See Clark v. DaimlerChrysler Corp.*, 268 Mich. App. 138, 142 (2005).

[2] Plaintiffs' ADEA and Elliot-Larsen Civil Rights Act are analyzed under the same evidentiary standards. *See Geiger v. Tower Automotive*, 579 F.3d 614, 626 (6th Cir. 2009) ("Because [plaintiff] had failed to present evidence sufficient to establish the elements of an ADEA claim, he has similarly failed to establish a *prima facie* case under the ELCRA.")

employers from discharging an employee "because of such individual's age." 29 U.S.C. § 623(a)(1).

*See Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010). A plaintiff

may proceed on a claim of age discrimination on the basis of direct or circumstantial evidence.

*Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 723 (6th Cir. 2012). "[W]ith both direct and

circumstantial evidence, the burden of persuasion remains on ADEA plaintiffs to demonstrate 'that

age was the 'but-for' cause of their employer's adverse action.'" *Geiger v. Tower Automotive*, 579

 F.3d 614, 620 (6th Cir. 2009) (quoting *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 129

(2009)).

"Direct evidence is 'that evidence which, if believed, requires the conclusion that unlawful

discrimination was at least a motivating factor in the employer's actions.'" *Lautermilch v. Findlay

Schools*, 314 F.3d 271, 275-76 (6th Cir. 2003) (quoting *Laderach v. U-Haul of Northwestern Ohio*,

207 F.3d 825, 829 (6th Cir. 2000)). "Rarely will there be direct evidence from the lips of the

defendant proclaiming his or her [discriminatory] animus." *Robinson v. Runyon*, 149 F.3d 507, 513

(6th Cir. 1998); *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348 (6th Cir.1997) ("It is the rare

situation when direct evidence of discrimination is readily available, thus victims of employment

discrimination are permitted to establish their cases through inferential and circumstantial proof.").

"[Direct] evidence would take the form, for example, of an employer telling an employee, 'I fired

you because you are disabled.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). In an

ADEA case based upon direct evidence of discrimination, the burden shifting framework utilized

under Title VII does not apply, i.e. the burden of persuasion does not shift to the employer to show

that it would have taken the action regardless of age. *Geiger*, 579 F.3d at 621. In a direct evidence

case, plaintiff must prove "'by a preponderance of the evidence . . . that age was the 'but-for' cause

of the challenged employer decision.'" *Id.* (quoting *Gross*, 557 U.S. at 174 n. 4).  Further, the remarks allegedly constituting direct evidence must be made in relation to the decision to terminate. *Geiger*, 578 F.3d at 621 (holding that statements "unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . . of demonstrating animus") (alteration in original) (internal quotation marks and citation omitted).

"[M]erely vague, ambiguous, or isolated remarks by a company agent which were not related to the decision-making process and are not proved to have been made proximate to the assailed adverse employment action cannot constitute sufficient direct evidence of age-inspired employment discrimination to create a jury question." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 586 n. 12 (6th Cir. 2003) (internal quotation marks and citations omitted) (alteration in original).  "The mere recognition, by an employer, of the universally known truth that certain individuals (as opposed to every individual in the protected age-defined category) may experience declining personal capabilities as they approach the traditional age of retirement, is not illegal . . . ." *Id.* at 587.  "Federal law does not immunize elderly workers from all forms of unfair employment treatment per se; rather, it shields them only from unfair treatment incited by age-related prejudice." *Id.*  On the other hand, referring to an employee as an "old man," or "old and inflexible" and "incapable," or attacking an employee's productivity because they are "old," can be indicia of discriminatory motive.  *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997). General inquiries by a supervisor or decision-maker regarding plans for retirement, which are not near in time to the adverse employment decision and do not suggest pressure to retire, are not sufficient to constitute direct evidence of age discrimination.  *Id.*

"If a plaintiff cannot prove discriminatory intent by direct evidence, he may do so by making

a *prima facie* case of age discrimination through indirect or circumstantial evidence." *Lefevers*, 667 F.3d at 725. Unlike in a case of age discrimination based upon direct evidence, the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, (1981), applies in an ADEA case where a plaintiff lacks direct evidence and chooses to proceed on the basis of circumstantial evidence. *Geiger*, 579 F.3d at 622. An ADEA plaintiff proceeding based upon circumstantial evidence must prove that: (1) he was at least 40 years old at the time of the alleged discrimination; (2) he suffered an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by someone outside the protected class. *Id*. at 622-23.

"If a plaintiff satisfies his burden at the *prima facie* stage, the burden of production shifts to the employer to set forth a legitimate, non-discriminatory reason for the adverse employment action. If the employer meets this burden, the burden of production shifts back to the plaintiff to show that the employer's explanation was a mere pretext for intentional age discrimination. The burden of persuasion, however, remains on the ADEA plaintiff at all times to demonstrate that age was the "but-for" cause of their employer's adverse action." *Schoonmaker*, 595 F.3d at 264 (internal citations and quotation marks omitted).

Once an employer rebuts a stated *prima facie* case with a legitimate, non-discriminatory reason for the adverse employment action, "the presumption of discrimination no longer exists, and [plaintiff] must prove that the reasons offered by the [employer] were in fact pretextual in order to prevail." *Browning v. Dep't of Army*, 436 F.3d 692, 695 (6th Cir. 2006). "For a plaintiff to show pretext, he must show the employer's given reason for its conduct 'had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's

19

challenged conduct.'" *Lefevers*, 667 F.3d at 725 (citing *Schoonmaker*, 595 F.3d at 268). To demonstrate pretext at the summary judgment stage, a plaintiff must produce sufficient evidence from which a jury could reasonably reject the employer's explanation for the adverse employment action. *Schoonmaker*, 595 F.3d at 268; *Browning*, 436 F.3d at 696. The burden of persuading the trier of fact remains at all times with the plaintiff. *Browning*, 436 F.3d at 696 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000)).

"An employer is entitled to summary judgment 'if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.'" *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

Dekarske's claims of age discrimination are based upon the conduct of his supervisor, Terry Feltman. Although Kenneth Wilson of FedEx Human Resources made the ultimate decision to affirm Dekarske's termination, there is no dispute that Feltman provided much of the factual information that underlie that decision and that Feltman made the initial recommendation that Dekarske be terminated. "Although remarks made by an individual who has no authority over the challenged employment action are not indicative of discriminatory intent, the statements of managerial-level employees who have the ability to influence a personnel decision are relevant." *Johnson v. Kroger Co.*, 319 F.3d 858, 868 (6th Cir. 2003) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-55 (1998)). "[A] jury could reasonably conclude that [Feltman] played a significant role in [the] decisionmaking process." *Id.* at 868. Thus, Feltman's comments and statements allegedly demonstrating an ageist bias are relevant.

20

Dekarske claims that he has produced direct evidence of Feltman's discriminatory intent through his own uncorroborated testimony that Feltman called him "an old man" probably "ten to twenty times" in connection with complaints that Dekarske was "slow." (Dekarske Dep. at 128-131.) Dekarske gave this testimony after a twenty minute break in his deposition and after having testified earlier that day that Feltman never said that Dekarske was slow because he was old - only that Dekarske was slow, from which Dekarske inferred that Feltman meant he was slow because he was old. (Dekarske Dep. at 83-84.) While the manner in which Dekarske "remembered" the crucial fact that Feltman had called him an "old man" on ten to twenty different occasions certainly tends to detract from the credibility of his testimony on this point, on summary judgment the Court must view the facts in the light most favorable to the non-moving party and cannot make credibility determinations or weigh the evidence. Moreover, in his April 8, 2008 internal complaint, Dekarske did state that Feltman kept "telling me or implying that I am slow because I am old." (Dekarske Dep. Ex. 16.) Accordingly, we must assume that Feltman repeatedly called him "old man," despite the fact that no FedEx witness could corroborate Dekarske's testimony and notwithstanding that Feltman flatly denies ever having called Dekarske "old man." (Def.'s Mot. Ex. I, Feltman Decl. ¶ 5.)

Dekarske also complains that Feltman "allowed a discriminatory employment atmosphere" to exist based upon the testimony of several FedEx witnesses that everyone called Dekarske "Gramps" and that it had more or less become his nickname. There is no evidence, however, that Feltman was aware that other FedEx employees were calling Dekarske Gramps and this is not evidence which requires a conclusion, without inference, that Feltman terminated Dekarske with discriminatory intent.

By contrast, calling an employee "an old man" ten to twenty times in connection with complaints that he is "slow," is the type of evidence that has been found sufficiently patent to constitute direct evidence of discriminatory intent and could be viewed as such by the Court for purposes of summary judgment. However, direct evidence of discriminatory remarks must also relate those remarks to the decision to terminate the employee. *Geiger*, 579 F.3d at 621 (holding that statements "unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . . of demonstrating animus") (alteration in original) (internal quotation marks and citation omitted); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) ("[S]tatements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden of demonstrating animus."). Here, Dekarske offers no temporal context for the alleged "ten to twenty" old man remarks allegedly made by Feltman. The statement in Dekarske's April 8, 2008 internal complaint, that Feltman implied that Dekarske was slow because he was old, is far too removed from the July, 2009 decision to terminate Dekarske to constitute direct evidence of discrimination.

Dekarske also argues that Feltman's inquiries regarding Dekarske's retirement plans are further direct evidence of discrimination. Feltman admits having asked Dekarske about his plans for retirement on at least one occasion but says that the inquiry was in the context of generally asking about Dekarske's plans for the future in a friendly way to get to know him better. (Def.'s Mot. Ex. I, Feltman Decl. ¶ 4.) There is no evidence, however, that any of Feltman's alleged comments regarding Dekarske's retirement plans were suggestive of pressure on Dekarske to retire. Dekarske's testimony on this point is that "maybe once or twice a year" Feltman would ask him when he was going to retire," and that finally Dekarske told Feltman not until he was "70 or 72 years

old," to which Feltman "laughed, chuckled." (Dekarske Dep. 42-43.) After this exchange, according to Dekarske, Feltman's inquiries about retirement stopped. (Pl.'s Resp. 8.) Thus, the retirement comments are not direct evidence of discrimination.

Although Dekarske fails to submit direct evidence of discrimination, Dekarske could still proceed under the *McDonnell Douglas* burden shifting test to attempt to establish discriminatory intent based on circumstantial evidence. This requires Dekarske to first establish a *prima facie* case with evidence that: (1) he was at least 40 years old at the time of the alleged discrimination; (2) he suffered an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by someone outside the protected class or that similarly situated individuals outside his protected class were treated more favorably. In this case, the first three factors are undisputed. FedEx disputes, however, that Dekarske was replaced at all, let alone by a younger individual outside the protected class and also argues that he cannot prove that similarly situated employees outside his protected class were treated more favorably than he.

Testimony on the point of Dekarske's replacement is in some dispute.   At the depositions of the FedEx employees, Dekarske's counsel repeatedly told the witnesses that there had been testimony that someone from the outside filled Dekarske's position and asked them if they recalled who replaced Dekarske. The source of this "testimony" is an enigma as none of the FedEx employees, aside from Feltman who clarified his testimony by affidavit, recalled that Dekarske was replaced by someone from outside. Christina Simpson testified that she did not think they put Dekarske's route up for bid but thought they had assigned part of it to another courier, Jeff Welch. (Def.'s Mot. Ex. G, Simpson Dep. at 20.) Barbara Spellman testified that she also believed that Jeff Welch (in his late forties) bid on Dekarske's route. (Def.'s Mot. Ex. H, Spellman Dep. at 10.)

23

Samuel Bishop testified that FedEx "compacted" Dekarske's route and no one "took it over," but Jeff Welch took some of it.  (Def.'s Mot. Ex. A, Bishop Dep. 22-23.)  Roger Dickinson testified that no one was hired to replace Dekarske – there was just a "mini restructure-type deal" to cover his previous route. (Def.'s Mot. Ex. C, Dickinson Dep. 35-36.)

At his deposition, Feltman testified that there came a time "when someone from the outside took Dekarske's position."  (Def.'s Mot. Ex. D, Feltman Dep. at 80.)  Feltman was having some difficulty recalling exactly what transpired with Dekarske's route, recalling that Jeff Welch ultimately took it over but also recalling that someone may have filled the spot before Welch.  (*Id.* at 79-81.)  Feltman later clarified this testimony via his declaration, recalling after further thought that he was mistaken at his deposition and that he did not hire anyone to replace Dekarske but rather spread his route out among several couriers, all of whom were over the age of 40, including Jeff Welch. (Def.'s Mot. Ex. I, Feltman Decl. ¶ 6.)  FedEx also produced the Declaration of Sharon Pasley, a paralegal employed by FedEx, which attached the business records of FedEx demonstrating that the position previously held by Dekarske has been vacant and left unfilled since Dekarske left on July 30, 2009.  (Def.'s Mot. Ex. L, August 21, 2012 Declaration of Sharon Pasley ¶ 5, Ex. 1.)  Dekarske's only rebuttal to this evidence is the unsubstantiated statement in his brief that "Feltman's and especially Barb Spellman's testimony raises an issue of fact as to whether Jeff Welch, 47, replaced Plaintiff and took over Plaintiff's route."  (Pl.'s Resp. 14.)

The Court concludes that this unsupported statement does not create a genuine issue of fact that Dekarske was replaced by someone outside his protected class in the face of the unrebutted Declaration of Sharon Pasley and the nearly unanimous testimony of the FedEx witnesses that the route was dispersed and that existing FedEx employees, including Jeff Welch, aged 47, absorbed

Dekarske's route. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

"Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992). In *Chen v. Dow Chemical Co.*, No. 07-10275, 2008 WL 880512 (E.D. Mich. March 31, 2008), *aff'd* 580 F.3d 394 (6th Cir. 2009), this Court examined the Sixth Circuit's decision in *Lilley* and held that spreading a terminated employees duties out among existing employees will be deemed a replacement if the practical effect is that new employees are hired to perform the work of the employees who absorb the terminated employee's work. This Court observed that reshuffling following a termination constitutes replacement in "'a situation in which A is fired, B and C are assigned each to do half the work formerly done by A, and D is hired to do the work of B and C that they must give up to do A's work.'" 2008 WL 880512, at *13 (quoting *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997)). In this case, Dekarske has produced no evidence that this "replacement" scenario occurred and indeed the evidence demonstrates that Dekarske's position was never filled and that other then-existing FedEx employees absorbed his route. Dekarske has not created a genuine issue of fact that he was "replaced" as required to satisfy the forth prong of his *prima facie* case.

Nor is there evidence that, as Dekarske claims, similarly situated younger employees were treated differently. "[T]o be deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's

treatment of them for it." *Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (6th Cir. 1992).  No one was similarly situated to Dekarske but treated differently by FedEx.  There is no evidence that FedEx retained an employee who received a previous discipline for failing to report a traffic violation, then failed to report an occurrence of damage to a customer's property of which they were admittedly aware and then paid that customer to keep his mouth shut about the damage.  Dekarske compares himself to two other FedEx employees, Dawn Dwyer and Samuel Bishop, who failed to report an occurrence but were not terminated; but in Dwyer's case the customer admitted that she had fabricated the incident to get FedEx's attention to a different matter that did not involve Dwyer at all (Feltman Dep. 63-64) and in Bishop's case, the unrebutted evidence established that he was unaware that he had hit the customer's mailbox, thus explaining why he failed to report the incident. (Feltman Dep. 61-62; Bishop Dep. 23-25.)  Here, it is undisputed that Dekarske acknowledged at the time of the incident that he damaged the customer's driveway marker because he offered the customer money to pay for the damage! Thus, Dekarske is not similarly situated to employees who were retained after failing to report damage that they did not in fact cause or were unaware of causing.

Dekarske also compares himself to two employees, David Jackson and Trish Johnson, who were involved in much more serious incidents, causing significant damage for which they were responsible, but who were retained by FedEx.  In each case, however, the damage was immediately reported to FedEx per the company policy for reporting accidents.  (Dekarske Dep. 106-07; Feltman Dep. 77; Jackson Dep. 15.)  Thus, none of these employees is similarly situated to Dekarske and their disparate treatment by FedEx does not create a genuine issue of fact as to FedEx's conduct in terminating Dekarske.

26

Dekarske has produced insufficient evidence to create a genuine issue of material fact that he was replaced by someone outside his protected class or that similarly situated employees were treated differently. Dekarske has not met his burden at the fourth prong of his *prima facie* case and FedEx is entitled to summary judgment.

Even assuming that Dekarske could establish a *prima facie* case, this only shifts the burden to FedEx to set forth a legitimate, non-discriminatory reason for the adverse employment action. FedEx has met this burden by proffering Dekarske's undisputed failure to report an occurrence in violation of FedEx policy, a terminable offense under FedEx policy. Once an employer rebuts a stated *prima facie* case with a legitimate, non-discriminatory reason for the adverse employment action, "the presumption of discrimination no longer exists, and [plaintiff] must prove that the reasons offered by the [employer] were in fact pretextual in order to prevail." *Browning*, 436 F.3d at 695. Accordingly, the burden of production shifts back to Dekarske to show that FedEx's explanation was a mere pretext for intentional age discrimination.

"For a plaintiff to show pretext, he must show the employer's given reason for its conduct 'had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct.'" *Lefevers*, 667 F.3d at 725 (citing *Schoonmaker*, 595 F.3d at 268). To demonstrate pretext at the summary judgment stage, a plaintiff must produce sufficient evidence from which a jury could reasonably reject the employer's explanation for the adverse employment action. *Schoonmaker*, 595 F.3d at 268; *Browning*, 436 F.3d at 696. "'[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there

was abundant and uncontroverted independent evidence that no discrimination had occurred.'" *Chen*, 580 F.3d at 400 n. 4) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).  Dekarske has not carried his burden of producing sufficient evidence from which a jury could reasonably reject FedEx's explanation for its decision to terminate Dekarske's employment.

Dekarske first argues that the stated reason, i.e. failure to report damage to the driveway marker, had no basis in fact because the photographs of the marker show no damage.  But this is irrelevant because Dekarske himself acknowledged the claimed damage by offering to pay the customer to cover the "damage" to the marker, an amount Dekarske felt was sufficient to cover whatever cost the customer incurred.  Dekarske next argues that his failure to report the damage to the customer's driveway marker was not sufficient to motivate the decision to terminate him because the damage was "minimal."  However, Dekarske misses the point -- he was not terminated due to the severity of the damage he caused but due to his failure to report it to FedEx and his decision to pay the customer to "keep his mouth shut."  There is no dispute that other FedEx couriers were involved in much more serious accidents and were not terminated.  Significantly, in each case the FedEx reporting policies were observed and there was no basis for discipline based on a failure to report.  Nor was Dekarske's belief that damage to a driveway marker was too insignificant to report shared by any of his courier colleagues.  Several of the FedEx couriers testified that they considered the damage to the driveway marker an occurrence that they would have been obligated to report under the FedEx Accident/Occurrence policy.  David Jackson testified that every time your FedEx vehicle comes in contact with something, it is a reportable incident.  (Def.'s Mot. Ex. E, Jackson Dep. 18.)  He specifically testified that he thought knocking over a reflective marker was an

occurrence that should be reported.  *Id*. at 22.  Christina Simpson testified that under the FedEx reporting policy, even if you nudge another car when parallel parking, you would have to report it as an occurrence.  (Def.'s Mot. Ex. G, Simpson Dep. 37.)   Samuel Bishop testified that if he knocked over a reflector *but did not damage it*, he would probably put it back where it was and go on his way, without reporting it to FedEx.  (Def.'s Mot. Ex. A, Bishop Dep. 15-16.)   No other FedEx courier testified that they had ever paid a customer to keep quiet about claimed property damage, indeed none had ever heard of such a thing, other than those who heard rumors that this is what had happened with Dekarske.  Given Dekarske's prior failure to report his speeding ticket, after which he was warned in writing that further conduct of that nature could result in termination, his failure to report even minor property damage, and to pay a customer to keep his mouth shut so that his failure to report would go undiscovered by FedEx, was sufficient to motivate the decision to terminate his employment.

Even assuming that Dekarske could establish a *prima facie* case of discrimination, he has not produced sufficient evidence on which a reasonable jury could reject FedEx's explanation for the adverse employment action.  The record "conclusively revealed [a] nondiscriminatory reason" for FedEx's decision to terminate his employment and Dekarske has created at best "only a weak issue of fact as to whether the employer's reason was untrue . . . ."  *Chen*, 580 F.3d at 400 n. 4. "[W]ith both direct and circumstantial evidence, the burden of persuasion remains on ADEA plaintiffs to demonstrate 'that age was the 'but-for' cause of their employer's adverse action.'" *Geiger*, 579 F.3d at 620. This Dekarske has failed to do.

### C.      FedEx Is Entitled to Summary Judgment on Dekarske's Retaliation Claim

Dekarske does not claim to have direct evidence of retaliation. "When a plaintiff presents

only circumstantial evidence of retaliation, we examine ADEA retaliation claims under the same *McDonnell Douglas/Burdine* framework used to assess discrimination claims." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). "In order to state a claim of retaliation under the ADEA based upon circumstantial evidence, [a plaintiff] must show: (1) that he engaged in protected activity; (2) that [his employer] had knowledge of his protected conduct; (3) that [his employer] took an adverse employment action towards him; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Fox v. Eagle Distributing Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007) (citing *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002)). "If Plaintiff establishes a *prima facie* case, the burden of production shifts to Defendant to articulate some legitimate, nondiscriminatory reason for [its action]. If Defendant succeeds in doing so, then the burden shifts back to Plaintiff to demonstrate that Defendant's proffered reason was not the true reason for the employment decision." *Spengler*, 615 F.3d at 492 (internal citations and quotation marks omitted) (alteration in original).

For purposes of summary judgment, FedEx does not dispute that Dekarske's April 8, 2008 internal complaint was protected activity under the ADEA and ELCRA and that his termination qualifies as a materially adverse action. FedEx argues, however, that Dekarske fails to state a *prima facie* case of retaliation because he cannot establish a causal connection between his April 8, 2008 protected activity and his July 23, 2009 termination. The Sixth Circuit has recently discussed the causal connection required to establish a retaliation claim under Title VII:[3]

---

[3] The Sixth Circuit has "explained that Title VII's anti-retaliation provision is similar in relevant respects to the ADEA's anti-retaliation provision, and that it is therefore appropriate to look to cases construing Title VII as a source of authority for interpreting the ADEA's anti-retaliation clause." *Fox Eagle*, 510 F.3d at 591.

A causal connection is established when a plaintiff proffers evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. Temporal proximity alone cannot establish a causal connection. However, temporal proximity always plays a role in establishing a causal connection; its significance depends on the context.

Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Fuhr v. Hazel Park School Dist.*, 710 F.3d 668, 675 (6th Cir. 2013) (internal citations and quotation marks omitted).

"[W]hile temporal proximity alone cannot establish a causal connection, a lack of temporal proximity alone can be fatal to an attempt to establish a causal connection" where the gap between the protected activity and the adverse employment action is significant. *Fuhr,* 710 F.3d at 676 (in a Title VII retaliation case, finding gaps of 20 months and two years fatal to establishing a causal connection). *See also Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (finding action taken 3-4 months after protected activity sufficiently temporally proximate to satisfy the causality required to establish a prima facie case, but holding that a gap of 20 months "suggests, by itself, no causality at all.") The Sixth Circuit has established an even shorter time spans for presuming causality. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) (noting that "cases that have permitted a *prima facie* case to be made based on the proximity of time have all been short periods of time, usually less than six months). The gap between Dekarske's protected activity in April, 2008 and his termination in July, 2009, a span of fifteen months, defeats any causal connection required to sustain Dekarske's *prima facie* case.

31

"While it is true that temporal proximity alone is insufficient to establish a causal connection for a retaliation claim, there are circumstances where temporal proximity considered with other evidence of retaliatory conduct would be sufficient to establish a causal connection." *Little v. BP Exploration & Oil Co*., 265 F.3d 357, 363-64 (6th Cir. 2001) (internal citations omitted).  In this case, Dekarske argues that Feltman retaliated against him following the April 8, 2008 internal complaint by adding stops to his routes and increasing the number of comments he placed in Dekarske's OLCC.  The most fundamental flaw in this argument is that the retaliatory conduct about which Dekarske complains, i.e. that Feltman began increasing his stops per hour, began *before* Dekarske filed his April 8, 2008 internal complaint.  In his deposition, Dekarske testified that because his route was less profitable, his hours were being cut back but at the same time Feltman was increasing his stops per hour to improve Dekarske's road performance.  (Dekarske Dep. 62-63; Def.'s Mot. Ex. 15, PgID# 462-63, OLCC entry for 1/30/08.)  Dekarske also admitted in his deposition that because of a downturn in overall business, similar changes were being made, and comments entered into OLCC, with respect to other (younger) courier's routes.  (Dekarske Dep. 74, 76-77, 136.)   Thus, the very action that Dekarske claims was taken in retaliation for filing his internal complaint was occurring before he filed that complaint.

Dekarske also complains that the number of entries that Feltman made into the OLCC increased after he filed his internal complaint.  But the monthly entries made by Feltman in Dekarske's OLCC began in January, 2008, before Dekarske filed his internal complaint.  (Dekarske Dep. Ex. 15, PgID# 463.)  Importantly, making monthly entries was Feltman's standard practice for giving feedback to the couriers; Feltman made similar monthly entries into other courier's OLCC files.  (Feltman Dep. 23-24, 78-79; Spellman Dep. 25; Simpson Dep. 27-28, 32-33, Ex. 1.)

Moreover, Dekarske complains about the number of entries but fails to mention that many of the comments were positive in nature (compliments) and were made by Feltman between the time of his internal complaint and his termination.  (Dekarske Dep. Ex. 15, PgID#459, 458, 457,456,453, 452, 451, 450, 449, 448, 447,445,443, 436, 435,434.)  Indeed, the last entry in the OLCC, July 3, 2009, was a compliment to Dekarske for exceeding his June road performance.  (Dekarske Dep. Ex. 15, PgID# 434.)

Dekarske has failed to establish a causal connection between his April 8, 2008 internal complaint and his July 23, 2009 termination.[4]  His claim is belied by the absence of temporal proximity and the lack of additional evidence of retaliatory conduct against him for engaging in his protected activity.  Dekarske was having trouble meeting his road performance goals prior to his internal complaint and his routes and hours were being changed, as were the routes and hours of other couriers.  He filed an internal complaint claiming unequal treatment that was investigated and denied by FedEx.  Over 15 months later, on July 23, 2009, Dekarske made the mistake of failing to report that he had damaged a customer's property (however minimal that damage may have been) and paying that customer to "keep his mouth shut," which, unfortunately for Dekarske, the customer did not do.  This was Dekarske's second significant failure to report under the FedEx policies, and was the legitimate business reason that FedEx terminated Dekarske.

---

[4]  Even if Dekarske were able to establish a causal connection, this would only call into play the *McDonnell Douglas* burden shifting framework.  For the same reasons discussed above with regard to Dekarske's ADEA discrimination claim, Dekarske fails to carry his burden of establishing pretext and has produced insufficient evidence on which a reasonable jury could reject FedEx's legitimate business reason and conclude that the desire to retaliate was the but-for cause of Dekarske's termination. *See University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2521 (2013) (holding that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.").

**IV.      CONCLUSION**

The Court concludes that Dekarske's claims are barred in their entirety by the six month limitation period he agreed to in his Employment Agreement with FedEx.  Even assuming the claims are not time barred, Dekarske has failed to state a *prima facie* case of discrimination or retaliation under the ADEA.  Even assuming he has established a *prima facie* case, he has failed to carry his burden of producing sufficient evidence to enable a reasonable jury to reject FedEx's legitimate business reason for terminating Dekarske and to conclude that FedEx fired him either because of his age or because he filed an internal complaint of discrimination.

Accordingly, the Court GRANTS FedEx's motion for summary judgment.

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 9, 2013



CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 9, 2013.


s/Deborah Tofil
Case Manager